## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| MELVIN ORTIZ<br><br>　　　　　**Plaintiff,**<br><br>　　**v.**<br><br>**GALE NORTON, SECRETARY OF THE INTERIOR, and UNITED STATES FISH AND WILDLIFE SERVICE,**<br><br>　　　　**Defendants.** | **Case No. CV-97-00738 JC/LFG** |

Plaintiff, through counsel, respectfully submits his proposed post-trial Findings of Fact and Conclusions of Law in this case.

### PLAINTIFF'S PROPOSED POST-TRIAL FINDINGS OF FACTS AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

1.　　Defendants are federal entities subject to the jurisdiction of this Court.

2.　　Plaintiff was formerly employed as a Realty Specialist by the federal Defendants in Albuquerque, New Mexico and is Hispanic.

3.　　Plaintiff was a credible witness.

4.　　Edward Candelaria is Hispanic and was Plaintiff's former supervisor, and the former Chief of the Realty Management Branch for U.S. FWS Region 2, and retired in January 1995.

5.　　Edward Candelaria had personal knowledge of the matters involving Plaintiff's work projects, his relationship with defendants, particularly Charles Ault, his prior EEO activity, his February 1995 leave requests and Plaintiff's post-incarceration efforts to communicate with his employers and keep his job. *See Testimony of Edward*

*Candelaria; Testimony of Mel Ortiz; Testimony of Caty Ortiz.*

6.     Edward Candelaria was a credible witness.

7.     Thomas Baca is Hispanic and is currently Chief, Division of Planning, National Wildlife Refuge System, in USFWS Region 2. *See Testimony of Thomas Baca*

8.     Thomas Baca had personal knowledge of the projects Plaintiff worked on, the racial and retaliatory animus of defendants, particularly Charles Ault, the racially discriminatory environment towards Hispanics generally in U.S. FWS Region 2 at the time of the events underlying this case, and the typical management practices in Region 2 regarding the handling of leave requests and allocation of workload on projects like those Plaintiff worked on. *See Testimony of Thomas Baca; Plaintiff's Exhibit* 8 (USFWS Memorandum Report on Discrimination and cover memorandum from Regional Director Nancy Kaufman October 30, 1995); *Plaintiff's Exhibit* 9 (Memorandum from Department of Interior to USFWS Director noting ongoing discrimination in Service March 14, 1996); *Plaintiff's Exhibit* 10 (Memorandum from Department of Interior to USFWS Director noting EEO concerns in Region 2 and removing personnel decisonmaking authority above GS-13 due to ongoing discrimination March 14, 1996); *Plaintiff's Exhibit* 22 (Letter to Bonnie Cohen, Assistant Secretary of Interior from Victor Segura and Tom Baca Complaining of Ongoing Discrimination Against Hispanics March 25, 1996); *Plaintiff's Exhibit* 28 (December 22, 1998 Report on Realty Division Management Practices by USDOI).

9.     Thomas Baca was a credible witness.

10.    Alvaro Fragoso is a real estate agent living in Arizona and represented the non-government party in the Bennett-Bartlett Land Exchange. *See Testimony of Alvaro Fragoso*; *see Plaintiff's Exhibit* 4A.

11.    Alvaro Fragoso was a credible witness.

12.    Joseph Riggs was Plaintiff's Appellate counsel in February 1995.

13.    Joseph Riggs was a credible witness.

14.    Jeannie Wagner-Greven was a co-worker of Plaintiff's and worked with him on the Bennett-Bartlett Exchange.

15.    Jeannie Wagner-Greven was a credible witness.

16.    Paul Cornes was a co-worker of Plaintiff's and worked with him on the Inholdings Inventory Project. *Testimony of Charles Ault; Testimony of Mel Ortiz.*

17.    Charles Ault was Plaintiff's immediate Supervisor at the time relevant to this case. *See Plaintiff's Exhibit* 20 (employee evaluations).

18.    Charles Ault was not a credible witness.

19.    Victor Segura was a Human Resources Officer at the time relevant to this case.

20.    Victor Segura was not a credible witness.

21.    Lynn Starnes was an Acting Assistant Regional Director at the time relevant to this case.

22.    Lynn Starnes was not a credible witness.

23.    Plaintiff filed an EEO complaint alleging national origin discrimination against his employer in 1991, and prevailed through settlement and was promoted to GS-12, awarded back pay and accrued interest. *See Defendants' Exhibit* 1.

24.    Plaintiff was re-assigned to Charles Ault's Supervision as a result of the EEO settlement. *See Defendants' Exhibit* 1.

25.    Plaintiff and his then Supervisor Edward Candelaria, expressed concern at the time of settlement that the placement under Charles Ault was to effectuate a retaliatory scheme against Plaintiff for his protected speech. *See Testimony of Mel Ortiz; Testimony of Edward Candelaria; Testimony of Thomas Baca.*

3

26.   Plaintiff's association with Edward Candelaria, a successful EEO claimant himself, who was a vocal critic of discriminatory practices by Defendants herein, caused reprisals from Charles Ault.   *See Testimony of Mel Ortiz; Testimony of Edward Candelaria; Testimony of Thomas Baca.*

27.   Plaintiff's employee ratings declined after he was placed under Charles Ault's supervision.   *See Plaintiff's Exhibit 20* (Plaintiff's Performance Evaluations (July 31, 1990, June 30, 1991, July 23, 1992, February 3, 1994, June 23, 1994).

28.   Charles Ault had a discriminatory and retaliatory bias against Plaintiff.   *See Testimony of Edward Candelaria; Testimony of Thomas Baca.*

## THE LEAVE REQUESTS IN FEBRUARY 1995 AND PLAINTIFF'S EFFORTS TO HAVE THE DENIALS REVERSED AND TO GET WORK RELEASE FROM PRISON

29.   In February 1995 Plaintiff had to begin a brief period of incarceration for an incident not involving his employment and requested emergency leave.   *Testimony of Mel Ortiz; Testimony of Victor Segura* (admitting prison is emergency); *Plaintiff's Exhibits 11 and 13.*

30.   The emergency arose because Plaintiff did not learn from his lawyer that his appeal was lost until only 5 days before he had to report to jail.   *Testimony of Joseph Riggs; Testimony of Mel Ortiz; Testimony of Edward Candelaria.*

31.   Plaintiff was eligible for work release after completing approximately 60 days of his sentence.   *See Plaintiff's Exhibit 31* (rules regarding work release); *Plaintiff's Exhibit 18* (letter from pre-release class supervisor to Mel Ortiz acknowledging his request to take class beginning April 1, 1995); *Testimony of Mel Ortiz.*

32.   Plaintiff could have returned to work around May 15, 1995.   *See Defendant's Exhibit B* (noting Plaintiff's arrival at the minimum security facility in March 1995 and the beginning of his good time credit period); *Plaintiff's Exhibit 31* (rules).

33.   Plaintiff requested leave without pay and annual leave to serve that portion of his

4

sentence that would make him eligible for work release. *Testimony of Mel Ortiz; see also Plaintiff's Exhibits* 11 and 13 (written leave requests).

34.  Plaintiff anticipated seeking all forms of leave that would be necessary to reach the work release point but needed his annual leave to give himself time to figure out the work release system. *Testimony of Mel Ortiz.*

35.  Charles Ault denied all of Plaintiff's leave requests.

36.  Charles Ault offered different reasons at different times but ultimately claimed the denials were mandated because of the Service's workload.

37.  Charles Ault was personally aware of Plaintiff's criminal conviction in 1994 and his need for leave to serve a brief period of incarceration at the time of his leave requests in 1995 and his denials of this fact were not credible. *Testimony of Edward Candelaria; Testimony of Mel Ortiz; Testimony of Thomas Baca.*

38.  Charles Ault also knew about Plaintiff's prior successful EEO activity and knew the underlying complaint was for discrimination. *Testimony of Charles Ault; Testimony of Edward Candelaria; Testimony of Thomas Baca.*

39.  Victor Segura, and Lynn Starnes knew about Plaintiff's prior successful EEO activity and knew the underlying complaint was for discrimination at the time of his leave requests in February 1995. *See Testimony of Victor Segura; Testimony of Lynn Starnes.*

40.  Edward Candelaria was personally aware of the Service accommodating other non-minority employee's leave requests like Plaintiff's, in both emergency and non-emergency settings.

41.  Thomas Baca was personally aware of the Service accommodating other minority employees' leave requests like Plaintiff's, in both emergency and non-emergency situations.

~WASH1:4590563.v1
309411-1

42.    Charles Ault believed Plaintiff and Edward Candelaria were troublemakers because of their prior EEO activity. *Testimony of Thomas Baca.*

43.    Charles Ault wanted to get rid of Plaintiff and lay in wait for his chance. *Testimony of Thomas Baca.*

44.    When Charles Ault told Thomas Baca that Plaintiff and Edward Candelaria were troublemakers, Thomas Baca understood Charles Ault to be referring to Plaintiff's prior EEO activity and the fact that Plaintiff was Hispanic, and believed Ault was trying to intimidate him, as a Hispanic male, from complaining about discrimination in the workplace. *Testimony of Thomas Baca.*

45.    Charles Ault seized on Plaintiff's emergency situation to manufacture a reason to terminate him and that the supposed heavy workload issue was nothing more than a pretext. *Testimony of Thomas Baca; Testimony of Edward Candelaria.*

46.    Plaintiff became ineligible for work release because of the denials of leave because it caused his employer to take action to have him removed from the Service and he did not meet the requirement for work release of having a job. *See Testimony of Mel Ortiz.*

47.    Neither Thomas Baca nor Edward Candelaria (both managers in Region 2) could recall another situation where a request for annual leave was denied based on a supposed workload issue. *Testimony of Thomas Baca; Testimony of Edward Candelaria.*

48.    Thomas Baca believed Plaintiff was highly qualified and that his termination hurt the Service. *Testimony of Thomas Baca.*

49.    The Government witnesses' testimony regarding the handling of Plaintiff's leave requests contained strained interpretations of the leave rules and glaring inconsistencies.

50.    Charles Ault's personal criteria for balancing the needs of the Service with the employees was 95 percent the needs of the Service and 5 percent the needs of the employee. *Cross-Examination of Charles Ault.*

6

51.   Charles Ault's personal criteria, including the "benefit to the service" analysis he used to evaluate Plaintiff's leave requests, were not consistent with Agency policy and were used to disguise discriminatory and retaliatory animus. *See Plaintiff's Exhibit* 12 (Ault denying leave because it did not benefit the Service).

52.   Charles Ault's testimony that Plaintiff did not provide a leave request form with a fixed period of time was an incredible or knowingly false reason for denying the requests and Ault was motivated by a discriminatory and retaliatory animus and his March 7, letter denying all leave requests, including annual leave due to existing workload on projects to which Plaintiff was assigned, intentionally obscured the fact that Plaintiff had submitted written leave requests with specific time periods in order to hide the existence of the time-specific leave requests from his superiors. *See Plaintiff's Exhibits* 11 and 13; *Exhibit 16 (letter misrepresenting number of leave requests and workload)*

53.   Technical deficiencies, if any, in the leave requests were irrelevant because Charles Ault would have denied the leave requests due to workload. *Testimony of Charles Ault; Testimony of Lynn Starnes.*

54.   Roger Abeyta was the Assistant Regional Director for Human Resources, U.S. FWS Region 2 and Region 2's EEO Officer. *See Plaintiff's Exhibits* 24, 25 and 29.

55.   Roger Abeyta was aware of Plaintiff's intention to qualify for work release to return to work in approximately 60 days and had discussed it with Supervisor Starnes and EEO Counselor Armijo. *Testimony of Victor Segura*; *Testimony of Edward Candelaria*; *Testimony of Mel Ortiz.*

56.   Roger Abeyta believed Charles Ault and other management employees denied Plaintiff's emergency leave requests as a pretext in order to make him AWOL so they could terminate him. *See Plaintiff's Exhibit* 24 (Memorandum to Nate Brown, Chief, Office of Human Resources from Roger Abeyta December 4, 1996); *Plaintiff's Exhibit* 25 (Memorandum to Nancy Kaufman, regional Director USFWS Region 2, from Roger Abeyta July 16, 1996); *Plaintiff's Exhibit* 29 (Memorandum to Regional Director from

7

Roger Abeyta regarding his belief that Agency discriminated June 6, 1996).

57. Roger Abeyta believed Plaintiff the denial of Plaintiff's leave requests constituted discrimination and that the Service should grant the leave requests. *See Plaintiff's Exhibit 24; Plaintiff's Exhibit 25; Plaintiff's Exhibit 29.*

58. Roger Abeyta recommended Plaintiff's leave requests be approved in February 1995. *See Plaintiff's Exhibit 24; Plaintiff's Exhibit 25; Plaintiff's Exhibit 29*

59. Three professional EEO experts of the Service, Roger Abeyta, Assistant Regional Director for Human Resources for U.S. FWS Regions 2, Thelma Jones, Chief, Branch of Complaints and Adjudications, and Nate Brown, Chief, National Office of Human Resources, examined the EEO record and agreed that Plaintiff was the victim of discrimination and should be reinstated. *See Plaintiff's Exhibit* 24 (Memorandum to Nate Brown, Chief, Office of Human Resources from Roger Abeyta December 4, 1996); *Plaintiff's Exhibit* 25 (Memorandum to Nancy Kaufman, regional Director USFWS Region 2, from Roger Abeyta July 16, 1996); *Plaintiff's Exhibit* 29 (Memorandum to Regional Director from Roger Abeyta regarding his belief that Agency discriminated June 6, 1996).

60. Charles Ault withheld information from his superiors regarding Plaintiff's leave requests, particularly the fact that Plaintiff submitted written requests with fixed time periods, and Ault seriously overstated the significance of the two projects Plaintiff was working on to create a false sense of necessity for Plaintiff's services. *See Plaintiff's Exhibits* 11 and 13; *Exhibit 16 (letter misrepresenting number of leave requests and workload); see also Cross-Examination of Lynn Starnes* (witness changed her testimony from her deposition where she said she had not been shown the time-specific leave requests to saying at trial that she did see them); *Testimony of Victor Segura* (witness changed his testimony from his deposition where he said he had not been shown the time-specific leave requests to saying at trial that he did see them)

61. The Government witnesses, Lynn Starnes and Victor Segura, changed their testimony

8

from their depositions regarding the information they received from Charles Ault at the time of the denial of leave requests.

62.  Director Starnes did not ask to see the documentation submitted by Plaintiff regarding his leave requests and instead relied only on what she was told by Charles Ault. *Cross-Examination of Lynn Starnes.*

63.  Director Starnes admitted the agency could have resolved the workload arising from Plaintiff's projects at the time his leave requests were denied. *Cross-Examination of Lynn Starnes.*

64.  Director Starnes admitted other employees were accommodated who had leave requests similar to Plaintiff's. *Cross Examination of Lynn Starnes.*

65.  Victor Segura advised Charles Ault that he believed incarceration was a personal emergency under the agency's rules. *Testimony of Victor Segura.*

66.  The proper chain of command for presenting claims of discrimination is to present them first to the agency's EEO counselors. *Testimony of Victor Segura.*

67.  Plaintiff, after his supervisor denied his leave requests, filed EEO complaints and communicated with his designated EEO counselor, John Armijo. *Testimony of Mel Ortiz; Testimony of Edward Candelaria.*

68.  Plaintiff informed USFWS EEO counsel John Armijo of his efforts to get work release and expected availability to return to work. *Testimony of Mel Ortiz; Testimony of Edward Candelaria; Testimony of Caty Ortiz.*

**OTHER EVIDENCE OF DISCRIMINATION AND RETALIATION IN
REGION TWO THAT IS PROBATIVE OF THE DISCRIMINATION AND
RETALIATION DIRECT AGAINST PLAINTIFF IN THIS CASE**

69.  A "glass ceiling" in USFWS Region 2 was identified in an internal DOI report and the report concluded there was widespread discrimination against Hispanic men at the time of the events in this case. *See Plaintiff's Exhibit* 8 (USFWS Memorandum Report on Discrimination and cover memorandum from Regional Director Nancy Kaufman

9

October 30, 1995);  *see also Plaintiff's Exhibit 9 and 10* (DOI internal memoranda discussing discrimination in Region 2 in the relevant time frame).

70.     The "glass ceiling" was maintained not only by outright refusals to promote, but by lesser measures designed to foreclose promotion opportunities, measures that harmed employees' records, such as denying leave requests like was done to Plaintiff. *See Testimony of Thomas Baca; Testimony of Edward Candelaria; see also Plaintiff's Exhibit* 28 (December 22, 1998 Report on Realty Division Management Practices by USDOI finding Mr. Ault misused leave policies, lacked the technical expertise to manage realty related projects, and was unable to fairly prioritize the Service's projects).

71.     A reasonable inference from the "glass ceiling" findings is that the same impermissible bias and retaliation animus underpinned management's decision regarding the decisions challenged in this case.

72.     Similarly situated non-minority employees were treated more favorably than the plaintiff regarding annual leave and leave without pay requests to address personal or family needs or emergencies.  *Testimony of Thomas Baca; Testimony of Edward Candelaria; Testimony of Victor Segura; Testimony of Lynn Starnes.*

73.     All Defendant agency witnesses admitted knowledge of the "glass ceiling" Report and its findings.

74.     The Government's only Hispanic witness admitted he agreed with the findings in the Report. *Testimony of Victor Segura*

75.     Government witness Victor Segura, signed a letter complaining of system-wide discrimination against Hispanics shortly after Plaintiff sought his leave requests. *See Plaintiff's Exhibit 22*

76.     Government witness Victor Segura, believed the findings of systematic discrimination in USFWS Region 2 contained in the "glass ceiling" report were accurate.

10

77.     Victor Segura believed he was retaliated against by agency Defendants for his having signed a letter complaining of discrimination at the agency around the same time Plaintiff was seeking emergency leave. *Testimony of Victor Segura; Plaintiff's Exhibit 22.*

78.     Charles Ault generally made his views known to other employee members of the same protected class that he would seize any pretext to terminate those he considered to be troublemakers, in order to intimidate those other protected class members from raising concerns about discrimination and retaliation. *Testimony of Thomas Baca.*

79.     Charles Ault lay in wait, to seize any opportunity that might provide a pretext to terminate those he considered to be troublemakers, like Plaintiff and Edward Candelaria. *Testimony of Thomas Baca. See Plaintiff's Exhibits 8, 9 and 10.*

## THE PROJECTS PLAINTIFF WORKED ON WERE NOT HARMED BY HIS ABSENCE AND CLAIMS TO THE CONTRARY BY AGENCY OFFICIALS WERE PRETEXTS TO DENY HIM LEAVE

80.     In February 1995 Plaintiff was not a project manager and did not have significant project management responsibilities. *See Testimony of Mel Ortiz; Testimony of Edward Candelaria; Testimony of Thomas Baca; Testimony of Charles Ault.*

81.     Plaintiff was assigned to two projects, the Bennett-Bartlett Land Exchange and the Inholdings Prioritization Projects.

82.     No contemporaneous agency record supports the claim that denial of Plaintiff's leave requests was based on a workload crisis on the two projects to which Plaintiff was assigned.

83.     Plaintiff was qualified and proficient in the performance of his duties and assignments. *See Plaintiff's Exhibit 20* (Plaintiff's Performance Evaluations (July 31, 1990, June 30, 1991, July 23, 1992, February 3, 1994, June 23, 1994).

84.     Plaintiff was adequately performing his duties on the Bennett-Bartlett Land Exchange in February 1995. *See Testimony of Mel Ortiz; Testimony of Jeannie Wagner-Greven;*

~WASH1:4590563.v1
309411-1

*Testimony of Alvaro Fragoso; Testimony of Charles Ault.*

85.   Edward Candelaria had personal knowledge of the projects to which Plaintiff was assigned in February 1995 because he was Plaintiff's former supervisor and had initiated the Bennett Bartlett Exchange project. *See Testimony of Edward Candelaria.*

86.   The Bennett-Bartlett Land Exchange was not a major project for USFWS Region 2, in terms of value or size of exchange, worth only approximately twenty-five thousand dollars. *Testimony of Thomas Baca; Testimony of Edward Candelaria; Testimony of Charles Ault.*

87.   Defendants' claim that substantial realty-related-work remained to be done on the Bennett-Bartlett Land Exchange was pretextual and false. *Cross-Examination of Charles Ault, Testimony of Alvaro Fragoso; Testimony of Jeannie Wagner-Greven.*

88.   Defendants' claim that realty-related-work that remained to be done on the Bennett-Bartlett Exchange could only be done by Plaintiff was pretextual and false. *See Plaintiff's Exhibit* 31; *see also Plaintiff's Exhibit* 4A (elements of real estate deal in place in 1993); Plaintiff's Exhibits 4I (delays unrelated to realty work in 1995); *Cross-examination of Charles Ault.*

89.   Agency documents established the delay in Spring 1995 in consummating the Bennett-Bartlett Land Exchange was caused by a biological contaminants survey ordered by Washington lawyers, and was not realty-related work that might be done by Plaintiff. *See Plaintiff's Exhibits* 2, 3 and 19.

90.   The realty part of the work on the Bennett-Bartlett Exchange that had been done by Plaintiff was completely adequate for the biologist who was undertaking the contaminants survey. *Testimony of Jeannie Wagner-Greven; see Plaintiff's Exhibit* 4C (final contaminants survey).

91.   The contaminants survey was not completed until July 1995, *see Plaintiff's Exhibit* 4C, and the next realty-related work does not appear in the agency's record until October 1995, *Plaintiff's Exhibit* 4K, long after Plaintiff could have returned to work in May

12

1995, thus the Service completely failed to demonstrate the delays with the Bennett-Bartlett Land Exchange or the Inholding Prioritization matter were in any way related to the presence of Plaintiff in the Spring of 1995.

92.   The realty specialist portion of a contaminants survey is to research land ownership records. *See Testimony of Thomas Baca*; *Testimony of Jeannie Wagner-Greven*; *Testimony of Mel Ortiz*; *Testimony of Alvaro Fragoso*; *Testimony of Charles Ault*.

93.   The realty portion of the Bennett-Bartlett Land Exchange was largely, if not completely, finished at the time of Plaintiff's leave requests in Spring 1995. *See Testimony of Jeannie Wagner-Greven*; *Testimony of Mel Ortiz*; *Testimony of Alvaro Fragoso*; *Testimony of Charles Ault*.

94.   Alvaro Fragoso believed Plaintiff's work on the project timely, professional and complete. *Testimony of Alvaro Fragoso*.

95.   Alvaro Fragoso placed two inquiries regarding the Bennett Bartlett Exchange to Washington, D.C., one to his Congressman, and one to the Department of Interior, asking about delays in completing the Exchange after he learned from Plaintiff the reason for the delay was a then pending decision in Washington, D.C., not a delay originating at USFWS Region 2. *Testimony of Alvaro Fragoso*.

96.   The first response he received was a November 1995 letter from Arizona Congressman Kolbe that the delay was caused by matters involving Washington D.C. He was never told the problems arose from USFWS Region 2. *See Plaintiff's Exhibit* 1 (Letter from Congressman Kolbe to Alvaro Fragoso November 14, 1995).

97.   The second response he received was a memorandum from the U.S. FWS management in Region 2 in December 1994 telling him the delay in the project at that time was caused by the Washington DC office of the Department of Interior and the Service attached two memoranda supporting its explanation. *See Plaintiff's Exhibit* 19 (Letter to Alvaro Fragoso from Joe Mazzoni December 7, 1994); *Plaintiff's Exhibit* 2 (USDOI Solicitor's Opinion on Bennett-Bartlett Land Exchange CERCLA Compliance

13

Requirements October 25, 1994); *Plaintiff's Exhibit* 3 (USDOI Office of Environmental Policy and Compliance Memorandum requesting additional review of Bartlett Tract for contaminants December 5, 1994).

98.     The USFWS Region 2 projected that it would a minimum of 60-90 days before it could submit the requested information to Washington and then it would have to be reviewed in Washington.   *See Plaintiff's Exhibit* 19 (Letter to Alvaro Fragoso from Joe Mazzoni).

99.     Alvaro Fragoso believed that there would be no final action until late Spring 1995 at the earliest. *See Testimony of Alvaro Fragoso.*

100.    Alvaro Fragoso received a letter dated April 26, 1995 from U.S. FWS Region 2 informing him the delays were ongoing. *See Plaintiff's Exhibit* 4 I.

101.    Alvaro Fragoso did not hear again from U.S. FWS until October 13, 1995.  *Testimony of Alvaro Fragoso; see also Plaintiff's Exhibit* 4K.

102.    The Bennett-Bartlett Land Exchange did not involve any significant negotiations but instead involved significant regulatory compliance issues regarding on-site contaminants. *See Testimony of Alvaro Fragoso; Testimony Thomas Baca; Testimony of Edward Candelaria; Testimony of J. Wagner-Greven.*

103.    Alvaro Fragoso testified that the elements of the exchange were established in 1993 in a letter he received from Plaintiff and the April 1995 draft agreement he received simply memorialized the same terms. *See Testimony of Alvaro Fragoso; see also Plaintiff's Exhibit* 4A.

104.    Plaintiff's absence did not delay the Bennett-Bartlett land exchange at all.  *Testimony of Alvaro Fragoso; Testimony of Jeannie Wagner-Greven; Testimony of Charles Ault.*

105.    The land exchange was finally consummated in December 1995. *Testimony of Alvaro*

14

*Fragoso; Plaintiff's Exhibit 6* (E-mail from Charles Ault to U.S. FWS employees noting consummation of Bennett-Bartlett Land Exchange December 18, 1995).

106.   Plaintiff's portion of the Inholdings Prioritization project was on schedule in February 1995. *See Defendants' Exhibit* N (assignments); *Plaintiffs' Exhibit* 27 (assignment printout with handwritten note from Mr. Ault finding Mr. Ortiz' report fully completed).

107.   Plaintiff's co-worker on the project, James Paul Cornes, believed that the project was not held up at all by Plaintiff's absence in Spring 1995. *Cross-Examination of Charles Ault.*

108.   Plaintiff's co-worker on the project, James Paul Cornes, believed that the Mr. Ault's expectations for the project were too high and based on his inexperience with realty matters. *Cross-examination of Charles Ault*; *see also Plaintiffs Exhibit* 28 (Realty Division employees finding Charles Ault lacked realty expertise and could not prioritize properly as a result).

109.   A portion of the Inholdings Prioritization Project was completed in 2001 or 2002, approximately six years after Charles Ault denied Plaintiff's leave requests because Plaintiff's presence was critical to the success of the project. *Testimony of Thomas Baca.*

110.   The overall project was abandoned after 2002 due to lack of funding. *Cross-Examination of Charles Ault.*

111.   Plaintiff's absence from work for approximately 90 days would have had no discernible impact on the work or timeliness of completion of the Inholdings Prioritization Project. *Testimony of Thomas Baca*; *Cross-Examination of Charles Ault.*

1.   Neither the Inholdings Prioritization project nor the Bennett-Bartlett Land Exchange were critical to the mission of the Service, and Plaintiff's input on either project was

~WASH1:4590563.v1
309411-1

not necessary for them to move forward in Spring 1995.

113. The realty work on the Inholdings project could have been done by any Realty Specialist in Region 2. *Testimony of Edward Candelaria; Testimony of Thomas Baca; see also Plaintiff's Exhibit* 31 (admitted in open court)(internal memorandum in Spring 1995 detailing that work on this project could be handled by any of the Realty specialists).

114. Had his annual leave and LWOP requests been strung together and granted, Plaintiff could have returned to work without any negative impact on the projects to which he was assigned and Plaintiff would not have been found to be AWOL. *Testimony of Charles Ault; Testimony of Alvaro Fragoso; Plaintiff's Exhibit* 4I (delay was again in April 1995); *Plaintiff's Exhibit* 4K (October 1945 update).

115. Had either leave request been granted, there would have been no compromise of the Service's execution of its duties and Plaintiff would not have been found to be AWOL.

116. Defendants' claim that the projects assigned to Plaintiff would be unduly delayed if Plaintiff's annual leave and leave without pay requests were granted, was pretextual and false and were made to cover up discriminatory and retaliatory misconduct. *Testimony of Thomas Baca, Testimony of Edward Candelaria; Testimony of Charles Ault, Testimony of Mel Ortiz.*

117. Plaintiff suffered damages as a result of defendant's retaliatory and discriminatory actions, including wrongful termination, lost back pay and related benefits, front pay and benefits, and emotional pain and suffering.

118. Plaintiff's damages entitle him to equitable relief and compensatory damages in the amount of $50,000 and an amount for pain and suffering and emotional distress that the court deems proper.

119. Any finding of fact listed herein that the Court deems to be more in the nature of a conclusion of law is herein incorporated by reference to the section styled

~WASH1:4590563.v1
309411-1

"Conclusions of Law."

## PROPOSED CONCLUSIONS OF LAW

1.    Annual leave is an entitlement of the employee.  *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.9.

2.    Annual leave is for the purpose of "time off for personal and emergency purposes." *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.9(G)2.

3.    LWOP is an authorization to be away from work that may be granted upon an employee's request.  *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.18.

4.    Leave without pay ("LWOP") may be used to fulfill parental or family responsibilities or to retain a desirable employee.  *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.18(B).

5.    Plaintiff's requests for annual leave and LWOP in February 1995 were "emergency" requests.  *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.6(H).

6.    If an employee has an emergency, the Service is obligated to waive the advance request for leave requirement and balance the needs of the employee more favorably vis a vis the Service. *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.6; § 2.9 (annual leave); § 2.20(J); § 2.21(A)(Government's Exhibit L).

7.    Charles Ault was Plaintiff's immediate supervisor, and denied each of Plaintiff's

~WASH1:4590563.v1
309411-1

emergency leave requests.

8.      Charles Ault's denial of Plaintiff's requests for annual leave and LWOP was *ultra vires* for each and all of the following reasons.   *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.7(C)(Government's Exhibit L)(rule mandating that action on extended leave requests be taken by person other than immediate supervisor).

>   a.      Charles Ault failed to provide adequate reasons for the denial of Plaintiff's leave requests in writing. *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.21(B).

>   b.      Charles Ault failed to carefully consider Plaintiff's emergency need for leave and impact on Plaintiff's family. *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.21(B).

>   c.      Charles Ault failed to discern whether Plaintiff had sufficient accrued leave for the category of leave requested. *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.21(C).

>   d.      Charles Ault failed to consider the emergency nature of the leave request and alter the typical analysis. *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.20(J)(Government's Exhibit L).

9.      Federal law requires the agency "balance" the needs of the employee with those of the service when evaluating leave requests.

>   Leave requests to take care of parental or other family responsibilities may not always permit adequate advance notification to the supervisor because of unanticipated emergencies or events that are beyond the employee's control.  The supervisor must balance what is a reasonable and manageable request with the workload to arrive at a determination.

>   *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.20(J).

10.     Plaintiff had both parental and familial responsibilities for which granting leave was

18

necessary.  *See* Testimony of Mel Ortiz; Testimony of Ed Candelaria; Testimony of Caty Ortiz.

11.   Charles Ault illegally imposed his personal leave policy and procedures to the Plaintiff, and exceeded the limits of Service policy by employing a "balance" of 95% the needs of the Service and 5% the needs of the employee.  *Testimony of Charles Ault.*

12.   When considering Plaintiff's parental and familial obligations as a basis for the emergency leave requests, the Defendants failed to:

   a.   extend consideration of the leave requests to find personally tailored and flexible ways to help employees meet their obligations; *see* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.19(B)(5).

   b.   administer leave policy equitably and reasonably; *see* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.19(B)(5).

   c.   utilize all forms of leave depending on the employees' need, and as may be appropriate and fair; *see* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.19(B)(5).

   d.   treat Plaintiff's unanticipated emergencies as waiving advance notice requirements; *see* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.19(I).

19

13.   Any reasonable evaluation and balancing of the needs of the Service with those of Plaintiff would have explicitly included evaluation of whether to:

   a.   Grant LWOP for up to 1 year.  *See* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.7(A)(authority of director).

   b.   Supplement Plaintiff's annual leave total by advancing annual leave he would have earned during that current leave year.  *See* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.9(D).

   c.   Supplement Plaintiff's annual leave total by advancing sick leave up to 1 month.  *See* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.10(G).

   d.   Supplement Plaintiff's annual leave total by advancing LWOP if his annual leave was insufficient to cover his emergency absence.  *See* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.21(C).

   e.   To change Plaintiff's absence from AWOL to LWOP up until the time of termination.  *See* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.18(B)(5).

   f.   Make reasonable efforts to return Plaintiff, a valued employee with notable expertise.

14.   Plaintiff's written request for LWOP and annual leave were sufficiently detailed to meet the requirements of the rules.  *See* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.18(A); § 2.21(A).

15.   Defendants failed to show that the denial of the leave requests was because Plaintiff's services were required or that it was based on the necessity for his services or other non-arbitrary reasons.  *See* <u>U.S. Fish and Wildlife Service Personnel</u>, Part 226 (Attendance and Leave) § 2.20(A).

16.   Defendants failed to show granting leave would have imposed a significant negative impact on the interests of the Service.  *See* <u>U.S. Fish and Wildlife Service Personnel</u>,

~WASH1:4590563.v1
309411-1

Part 226 (Attendance and Leave) § 2.9.

17.   Plaintiff's services during February to June 1995 were not a necessity to any project upon which he was working, nor to the mission of the Service.  *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.21(B).

18.   Plaintiff, in February 1995, was not assigned to any project critical to the mission of the service, as that term is used in the U.S. FWS leave rules.  *See* U.S. Fish and Wildlife Service Personnel, Part 226 (Attendance and Leave) § 2.21(B).

19.   Plaintiff could have returned to work while each of the two projects were ongoing, and with no delay arising from his absence that harmed or inordinately delayed the projects.

20.   Charles Ault acted with retaliatory and discriminatory animus when denying Plaintiff's leave requests and Defendant agency failed to articulate a legitimate, nondiscriminatory, non-retaliatory reason for denying Plaintiff's leave requests.

21.   Charles Ault lay in wait for an opportunity to arise where he could take discriminatory action and his 1994 comments about getting rid of Plaintiff if he ever go the chance were not too attenuated in time to be animating force for the discrimination and retaliation.

22.   The Defendant agency's proffered workload explanation for its actions was pretextual, unbelievable and was designed to cover retaliatory and discriminatory animus.

23.   The timing of the claim by the management witnesses that the two projects Plaintiff

was working on were suddenly collapsing or would be unduly delayed by his absence were incredible and support an inference of discrimination and retaliation.

24.    The Defendant agency failed to show its finding of AWOL was preceded by a legitimate denial of a request for annual leave.

25.    The Defendant agency failed to follow its own rules regarding "emergency" leave requests.

26.    Discrimination and retaliation were the motivating factors in denying Plaintiff's leave requests and the denial was for the purpose of manufacturing the predicate AWOL finding necessary for termination.

27.    The Defendant agency would not have reached the same decision regarding Plaintiff's leave requests or its finding that Plaintiff was AWOL in the absence of the impermissible discriminatory and retaliatory animus.

28.    Plaintiff established a *prima facie* case of discrimination and retaliation under Title VII and Defendants' purported legitimate business reason for denial of his leave requests was pre-textual, false and arose out of retaliatory and discriminatory animus. *See* Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)(prima facie case can support ultimate finding of discrimination); St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

29.    Plaintiff suffered intentional discrimination and retaliation in the handling of his leave requests, and his termination for being AWOL was merely the administrative conclusion of the prior discrimination and retaliation. *See* Benally v. Department of the Interior, 71 M.S.P.R. 537, 541-42 (1996)(noting AWOL determination, when

preceded by denial of leave, must be carefully scrutinized); <u>Willis v. Department of the Army</u>, 52 M.S.P.R. 9, 11-12 (1991)(same); <u>Henderson v. U.S. Postal Service</u>, 36 M.S.P.R. 11, 15-16 (1987)(same); <u>Martinez v. Orr</u>, 738 F.2d 1107, 1110 (10th Cir. 1984)(must examine facts to fulfill purpose of Title VII).

30.    Plaintiff suffered damages as a result of defendant's retaliatory and discriminatory actions, including wrongful termination, lost back pay and related benefits, front pay and benefits, and emotional pain and suffering.

31.    Plaintiff's damages entitle him to equitable relief and compensatory damages in the amount of $50,000.

32.    Plaintiff's damages entitle him to relief for emotional pain and suffering in an amount this Court determines appropriate

33.    Any conclusion of law listed herein that the Court deems to be more in the nature of a finding of fact is incorporated by reference to the section styled "Findings of Fact"


                              Respectfully submitted,


                              *Electronically Filed*
                              William J. Friedman
                              Piper Rudnick LLP
                              1200 Nineteenth Street, N.W.
                              Washington, D.C. 20036-2412
                              Telephone: 202-861-3474
                              Fax: 202-223-2085
                              e-mail: william.friedman@piperrudnick.com

                              and


                              *Electronically Filed*
                              Philip B. Davis, Esq.
                              814 Marquette Avenue, N.W.
                              Albuquerque, New Mexico 87102

                                       23

505-242-1904

Attorneys for Plaintiff

~WASH1:4590563.v1
309411-1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **MELVIN ORTIZ**<br><br>          **Plaintiff,**<br>**Vs.**<br><br>**GALE NORTON, SECRETARY OF THE INTERIOR, and UNITED STATES FISH AND WILDLIFE SERVICE,**<br>          **Defendants.** | **Case No. CV-97-00738 JC/LFG** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify a copy of the foregoing Plaintiff's Findings of Fact  and Conclusions of Law were filed electronically with the Court this 10th day of June, 2004, and mailed to opposing counsel listed below the 11th day of June, 2004.

> Michael H. Hoses, Esq.
> Office of the United States Attorney
> P.O. Box 607
> Albuquerque, New Mexico  87103-0607

> *Electronically Filed* _____
> William J. Friedman
> Piper Rudnick LLP
> 1200 Nineteenth Street, N.W.
> Washington, D.C. 20036-2412
> Telephone: 202-861-3474
> Fax: 202-223-2085
> e-mail:  william.friedman@piperrudnick.com